IN THE SUPREME COURT OF NORTH CAROLINA

No. 172A19

Filed 24 January 2020

IN THE MATTER OF: J.H., Z.R., A.R., D.R.

Consolidated appeal pursuant to N.C.G.S. § 7B-1001(a1) and on writ of certiorari pursuant to N.C.G.S. § 7A-32(b) from orders entered on 26 February 2018 and 6 February 2019 by Judge Denise S. Hartsfield, in District Court, Forsyth County. This matter was calendared in the Supreme Court on 17 January 2020 but was determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

> *Theresa A. Boucher, Assistant County Attorney, for petitioner-appellee Forsyth County Department of Social Services.*
>
> *Parker Poe Adams & Bernstein LLP, by Brandon Duckworth, for appellee Guardian ad Litem.*
>
> *Sydney Batch for respondent-appellant mother.*

EARLS, Justice.

Respondent appeals from the trial court's 26 February 2018 permanency planning order and from its 6 February 2019 order terminating her parental rights to Jared, Zendaya, Aaron, and Devon.[1] We affirm.

Background

---

[1] Pseudonyms are used to protect the identity of the juveniles and for ease of reading.

Respondent is the mother of nine children. Four of her older children were adjudicated abused or neglected and she relinquished her parental rights with regard to those children in 2008. Over the last twenty years, respondent and her children have been the subjects of over forty Child Protective Services reports.

More recently, the Forsyth County Department of Social Services (DSS) received a report on or about 21 October 2016 that respondent was using inappropriate discipline by punching her sons Jared (age 9 at the time) and Devon (age 8 at the time). Two reports were made to DSS on or about 10 November 2016. The first concerned an injury to Devon's top lip that required medical attention. The second report indicated that respondent's daughter Zendaya (age 4 at the time) had been sexually abused by Zendaya's adult brother, I.H., one of respondent's older sons. The sexual abuse occurred after respondent was evicted from her home and had moved into I.H.'s home. Prior to moving in with I.H., respondent was aware of the dangers I.H. posed to her children. Specifically, DSS advised respondent multiple times that I.H. posed a risk of harm to the younger children and, earlier in 2016, I.H. had been named as a sexual offender in a report involving the sexual abuse of respondent's son, Jared. Jared, Zendaya, Aaron, and Devon were removed from the care, custody, and control of respondent on 11 November 2016.

On 3 April 2017, the trial court adjudicated Jared, Zendaya, Aaron, and Devon to be abused and neglected. In its order, the trial court required respondent to take a number of steps in order to reunify with her children, including:

a)   Complete a mental health assessment and follow all the recommendations of her assessment.

b)   Maintain employment to demonstrate her ability to provide for herself and her children for a minimum of six months.

c)   Maintain appropriate and safe housing for herself and her children for a minimum of six months.

d)   Participate in parent coaching to change and develop appropriate ways to parent her children and implement those skills during visits. [Respondent] is to follow the recommendations of the parent coach.

e)   That [respondent] signs the necessary release forms to allow FCDSS and the Courts to monitor her progress.

The trial court held a review hearing on 31 May 2017, followed by a permanency planning hearing on 1 September 2017. Following the latter hearing, the court entered an order on 8 December 2017 finding that respondent was thus far "in compliance with her court plan and has made progress," but that "[respondent] can not safely parent her children. The Court continues to have concerns about the safety of [respondent's] new baby in her home."

The court held another permanency planning hearing on 24 January 2018. In its subsequent written order filed 26 February 2018, the court found that respondent had complied with some of the terms of her case plan while failing to comply with others. The court found that "[respondent] has made some progress but still demonstrates that she cannot safely parent her children" and that "the issues that brought the children into care are still present." After noting that DSS had filed petitions to terminate respondent's rights on 5 January 2018, the court ordered the

cessation of reunification efforts and visitation between respondent and her children, ordered that the permanent plan for Zendaya, Aaron, and Devon be reunification with the father with a secondary plan of adoption, and ordered that the permanent plan for Jared be reunification with the father with a secondary plan of adoption. On 23 March 2018, respondent filed a "NOTICE TO PRESERVE RIGHT OF APPEAL" of the 26 February 2018 order ceasing reunification efforts.

The trial court held a termination of parental rights hearing on 12 September 2018. At the conclusion of the hearing, the trial court terminated respondent's parental rights as to these four children. The termination of parental rights order was filed on 6 February 2019. In its order, the court found that respondent did not successfully complete compliance with the prior orders of the courts, including, *inter alia*, by failing to demonstrate safe parenting skills during the 22 months her children were in the custody of DSS and failing to successfully complete parenting classes. The court concluded that respondent had abused and neglected Jared, Zendaya, Aaron, and Devon and that grounds existed to terminate respondent's parental rights under N.C.G.S. § 7B-1111(a)(1). Furthermore, the court concluded that respondent "failed to demonstrate . . . that she can safely maintain her children in a safe home," that return of the children to respondent "would result in a strong likelihood of repeated abuse or neglect of the children," and that it is in the best interests of the children to terminate respondent's parental rights. On 28 February 2019, respondent filed a notice of appeal.

Cessation of Reunification

Respondent first contends that the trial court erred in its 26 February 2018 permanency planning order ceasing reunification efforts and excluding reunification with respondent as a permanent plan (the cessation order).[2] We hold that the trial court's findings are supported by competent evidence and that its permanency planning order was not an abuse of discretion.

"Our review of [a] cease reunification order . . . 'is limited to whether there is competent evidence in the record to support the findings [of fact] and whether the findings support the conclusions of law.'" *In re L.M.T.*, 367 N.C. 165, 168, 752 S.E.2d 453, 455 (2013) (second alteration in original) (quoting *In re P.O.*, 207 N.C. App. 35, 41, 698 S.E.2d 525, 530 (2010)). "The trial court's findings of fact are conclusive on appeal if supported by any competent evidence." *Id.* (citing *In re P.O.*, 207 N.C. App. at 41, 698 S.E.2d at 530). Further, we agree with the Court of Appeals that we review an order ceasing reunification "to determine . . . whether the trial court abused its discretion with respect to disposition." *See In re N.G.*, 186 N.C. App. 1, 10, 650 S.E.2d

---

[2] Respondent filed her appeal of the termination of her parental rights in this Court but simultaneously filed her appeal of the cessation order in the Court of Appeals. On 17 June 2019, DSS filed a motion at the Court of Appeals to dismiss respondent's appeal of the cessation order based upon potential procedural issues with respondent's appeal. Respondent filed a response, arguing that DSS's contentions were without merit. On 14 November 2019, this Court "acting on its own motion, in order to resolve expeditiously all of the issues relating to these children, . . . issue[d] a writ of certiorari, . . . to consolidate both matters for review in this Court, as contemplated by N.C.G.S. § 7B-1001(a1)(2)." We decline to address those procedural issues here given our determination that, in any event, the trial court did not err in its cessation order.

45, 51 (2007) (quoting *In re C.M.*, 183 N.C. App. 207, 213, 644 S.E.2d 588, 594 (2007)), *aff'd per curiam*, 362 N.C. 229, 657 S.E.2d 355 (2008). "At the disposition stage, the trial court solely considers the best interests of the child. Nonetheless, facts found by the trial court are binding absent a showing of an abuse of discretion." *Id.* at 10, 650 S.E.2d at 51 (quoting *In re Pittman*, 149 N.C. App. 756, 766, 561 S.E.2d 560, 567 (2002). "An abuse of discretion occurs when the trial court's ruling is so arbitrary that it could not have been the result of a reasoned decision." *Id.* at 10–11, 650 S.E.2d at 51 (quoting *In re Robinson*, 151 N.C. App. 733, 737, 567 S.E.2d 227, 229 (2002)).

At a permanency planning hearing, "[r]eunification shall be a primary or secondary plan unless," *inter alia*, "the court makes written findings that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety." N.C.G.S. § 7B-906.2(b) (2019). Additionally, the court must make findings "which shall demonstrate the degree of success or failure toward reunification," including:

> (1) Whether the parent is making adequate progress within a reasonable period of time under the plan.
>
> (2) Whether the parent is actively participating in or cooperating with the plan, the department, and the guardian ad litem for the juvenile.
>
> (3) Whether the parent remains available to the court, the department, and the guardian ad litem for the juvenile.
>
> (4) Whether the parent is acting in a manner inconsistent with the health or safety of the juvenile.

*Id.* § 7B-906.2(d). This Court has stated in the context of orders ceasing reunification efforts that "[t]he trial court's written findings must address the statute's concerns, but need not quote its exact language." *In re L.M.T.*, 367 N.C. 165, 168, 752 S.E.2d 453, 455 (2013).

Here the trial court found that respondent completed a mental health assessment, signed the requisite release forms, and maintained, at the time of the hearing, an appropriate home. On the other hand, the trial court found that respondent was unemployed and was not in compliance with the requirement that she maintain employment and demonstrate her ability to provide for herself and her children for a period of six months. Additionally, the trial court found that while respondent participated in parent coaching, the parenting coach "reported that parenting coaching should be discontinued" due to respondent's slow progress and struggles with parenting her children. The court further found that "[respondent] has made some progress but still demonstrates that she cannot safely parent her children" and that "the issues that brought the children into care are still present." The Court determined that return of the children "to the home of their parents would be contrary to the welfare of the juveniles at this time."

Respondent contends that, with respect to her parenting skills, the trial court's finding that she only made "some progress" was unsupported by evidence. Yet, the weekly reports from the parent coaching sessions catalogue how respondent, rather than listening to the coach and implementing suggested strategies, became

argumentative, failed to follow simple instructions, and would threaten to leave the sessions. On one occasion, respondent "pin[ned] [Aaron] to the ground using her weight to restrain him," and when asked by the parenting coach not to lie on the child because doing so could cause injury, began yelling at the coach and then left the session. Respondent brought food for the children to which they were allergic, stating that she was "aware of the allergies but 'they only cause diarrhea.'" Additionally, the parenting coach reported that she "asked [respondent] weekly for the last two months to bring diapers for [Devon] and every week she has a different reason for not bringing the diapers. I ask her again if she remembered to bring a diaper. She did not." The parenting coach ultimately reported:

> I'm recommending coaching services be discontinued for [respondent]. She has been consistent with visits and appears to enjoy spending time with her children when they are compliant. However, she is not making the effort or showing improvement when parenting is difficult. She has four children with severe trauma and/or developmental disabilities. Parenting will be difficult, challenging and stressful. . . . Both [Aaron] and [Devon] can be defiant, difficult to communicate with and require consistent and constant monitoring. [Respondent] avoids engaging the children when they [ ] need the additional attention. When I try to redirect her, she is argumentative o[r] simply ignores my suggestions. This behavior/conflict is not productive and sets a poor example for the children.

Similarly, the parenting coach reported that she explained to respondent:

> I also wanted her to know it is my recommendation that coaching services be terminated because she is not making progress and some of the reasons I believe this is so, specifically she feels there is no need for services or room

-8-

> for growth. In addition, I believe she sees coaching as punitive and is therefore defensive when I offer suggestions or recommendations. I have seen the children, specifically [Jared], negatively impacted by her response to me and this does not benefit her, them or the process.

We conclude that there was ample evidentiary support for the trial court's finding that respondent only made "some progress" with respect to her parenting skills. Moreover, we conclude that, given the trial court's extensive findings about respondent's degree of progress and the underlying evidence, the trial court did not abuse its discretion in determining that ceasing reunification was in the best interests of the children.

<u>Termination of Parental Rights</u>

A termination of parental rights proceeding involves two stages: an adjudicatory stage and a dispositional stage. *See In re Montgomery*, 311 N.C. 101, 110, 316 S.E.2d 246, 252 (1984). During the adjudicatory stage, the party petitioning for the termination of parental rights must show the existence of one or more of the statutory grounds for termination of parental rights by clear, cogent, and convincing evidence. N.C.G.S. § 7B-1109 (2017). In this appeal, respondent does not challenge the trial court's findings that these four children are abused or neglected and that statutory grounds exist to terminate her parental rights.

Having found grounds to terminate respondent's parental rights, the trial court then moved to the dispositional stage, where it examined whether the termination of parental rights is in the best interests of the children. *See* N.C.G.S. §

7B-1110. We review the trial court's decision to terminate parental rights at the disposition stage for abuse of discretion. *In re D.L.W.*, 368 N.C. 835, 842, 788 S.E.2d 162, 167 (2016) (citations omitted). "[A]buse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *In re T.L.H.*, 368 N.C. 101, 107, 772 S.E.2d 451, 455 (2015) (quoting *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988)). We find no such abuse of discretion in this case.

In determining the best interests of a child during the dispositional phase of the termination of parental rights hearing, the trial court must make relevant findings concerning: (1) the age of the juvenile, (2) the likelihood of adoption, (3) whether termination will aid in the accomplishment of the permanent plan, (4) the bond between juvenile and the parent, (5) the quality of the relationship between the juvenile and the proposed permanent placement, and (6) any relevant consideration. N.C.G.S. § 7B-1110(a). The trial court made findings related to each issue enumerated by statute, and individually determined that Jared, Zendaya, Aaron, and Devon each had a "high probability" of adoption. Respondent argues that the trial court erred in terminating her parental rights solely because she believes it is unlikely the children would be adopted due to their numerous serious developmental challenges. However, the record shows that the trial court thoroughly considered the children's developmental challenges and their likelihood of adoption based on their current placement and potential future adoptive parents.

**Jared**

The trial court found that Jared has "special mental health and educational needs," has a learning disability, and has been diagnosed with Post-Traumatic Stress Disorder (PTSD) and ADHD for which he is prescribed medication. In determining Jared's probability of adoption the trial court found:

> [Jared] is 11 years old. He is placed in the home of his father and stepmother. He is receiving good and safe care in this home. There is a high likelihood that a stepparent adoption can occur for Jared so that he will have an intact two-parent home.

At the time of the termination hearing Jared was in the care of his biological father, his step-mother, and his sixteen year old sister. The evidence presented at the hearing showed that Jared is bonded with his biological father and that if he remains with his father, there is a strong likelihood of stepparent adoption. Thus, there is evidence in the record to support the trial court's finding that Jared was likely to be adopted even though he has a learning disability and other challenges.

**Devon**

The trial court found that Devon has "very special needs." At ten years old, he has severe intellectual disabilities, is not toilet trained, and is non-verbal. Devon is learning sign language in order to communicate his needs. Further, the trial court found that Devon has received an Innovations Waiver, which will provide him with necessary services for the rest of his life. In considering the probability that Devon would be adopted, the trial court found:

> There is a high likelihood of [a]doption and there is an identified prospective adoptive home for [Devon] but he is not living in that home at this time. The maternal grandmother has expressed interest in adopting [Devon] and all of his siblings. The Court is unable to determine the quality of that relationship.
>
> . . . .
>
> [Devon] is currently placed in a specialized facility . . . .. [Devon] is doing well in this facility and he has learned to swim. He is also learning to ride a bike. [Devon] is learning to have positive peer relationships and is making improvements in this area.

The trial court heard testimony that Devon was thriving in his current placement. There was evidence to support the trial court's conclusion that despite Devon's developmental challenges his probability of adoption was high because there is a prospective adoptive home for him in addition to the desire of his maternal grandmother to adopt him.

**Aaron**

The trial court found that Aaron has "special needs" and that he has been diagnosed with mild intellectual disabilities. Aaron has an Individual Education Plan and is diagnosed with ADHD for which he receives medication. In determining Aaron's probability of adoption the trial court found:

> [Aaron] is 6 years old. The likelihood for Adoption is very likely.
>
> . . . .
>
> [Aaron] is placed in a prospective adoptive home and he has

a very good relationship with his prospective adoptive parent. [Aaron] looks to her for comfort and guidance. He is thriving in this home. His communication skills have improved greatly. In this home he has a same-age sibling and the two children have a close relationship.

At the termination hearing, Ms. Tonya Britton, a foster care social worker with DSS, summarized Aaron's progress with his prospective adoptive parent:

> Q. What is the quality of relationship between [Aaron] and his prospective adoptive parent?
>
> A. He's very bonded to her. He's called her Mom. He also has a foster brother in the home as well that he's very, very close to. They are the same age.
>
> Q. Does he look to her for comfort and guidance?
>
> A. Yes, he does.
>
> Q. When you have visited him in that home, does he appear to be at home there?
>
> A. Yes. . . . He has thrived in that home to the point that he has been caught up, as far as some of the educational things that he was behind in. He's communicating a whole lot better now. He could have a conversation with you, compared to when he didn't used to talk at all, or you couldn't understand what he was saying.

The testimony presented at trial supported the court's finding that even in light of his special needs, Aaron was likely to be adopted.

**Zendaya**

The trial court found that Zendaya has "special needs." Further, the trial court found that Zendaya was sexually molested by her brother I.H. and needs ongoing

support and therapy. Zendaya has been diagnosed with PTSD but is making

significant progress since her removal from her mother's home. With regard to the

probability of Zendaya's adoption the trial court found:

> [Zendaya] is 5 years old. The likelihood of Adoption for [Zendaya] is very high. There are multiple families interested in adopting her.
>
> . . . .
>
> [Zendaya] is in kindergarten and is making educational progress.
>
> [Zendaya] has a safe and nurturing relationship with her current caregivers, who are prospective adoptive parents. [Zendaya] looks to them for comfort and guidance. She is involved in community and church activities with her prospective adoptive [parents]. She is thriving in this home.

The evidence at trial established that Zendaya was thriving in her current placement,

even calling her prospective adoptive parents "Daddy, and Mom." Zendaya has

multiple potential adoptive families and there was testimony that the prospect of her

being adopted was "[v]ery, very, very, very likely." The trial court's finding that

Zendaya was likely to be adopted despite her developmental challenges was

supported by clear, cogent and convincing evidence in the record.

Respondent argues that children with behavioral challenges and/or

developmental delays, as well as children in foster care, are difficult to place with

adoptive families. Such general truths cannot overcome the particularized evidence

in this case supporting the trial court's factual findings that each of these children

had a high probability of being adopted.  Notably, as relevant to the ultimate conclusion that termination of respondent's parental rights is in the children's best interests, there was also testimony that Jared, Devon, Aaron and Zendaya are thriving and showing great improvement developmentally in their current placements.  This evidence suggests they are benefitting from not being in the custody and control of respondent.  The trial court did not abuse its discretion in concluding that it was in the children's best interests to terminate respondent's parental rights.

AFFIRMED.